IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHESTER SULLIVAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 04-0473-WS-M |
| | ) | |
| CITY OF SATSUMA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

This matter is before the Court on defendants' Motion for Summary Judgment (doc. 22).  The Motion has been briefed and is ripe for disposition at this time.  Also pending is defendants' Motion to Strike (doc. 37) portions of plaintiff's declaration.

I.    **Background.**

A.    *Procedural Posture.*

Plaintiff Shester Sullivan is an African-American male who is and has been employed by defendant City of Satsuma (the "City") as an hourly, nonexempt worker for seven years.  His direct supervisor at all material times has been defendant James Elmore, the City's Public Works Supervisor. On July 16, 2004, Sullivan filed the Complaint, alleging claims of race discrimination and retaliation against the City pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, as well as a claim against Elmore in his individual capacity under 42 U.S.C. § 1983.[1]  The § 1983 claim asserts that Elmore violated Sullivan's equal protection rights under the Fourteenth Amendment by engaging in race discrimination and retaliation under color of law.

Following the close of discovery, defendants moved for summary judgment on both the race discrimination and retaliation claims, arguing that Sullivan had failed to meet his burden under the

---

[1]    Although the Complaint does not delineate the causes of action as clearly as it could, it is evident that Sullivan's claims against the City are confined to Title VII theories of liability, while those against Elmore invoke § 1983.

circumstantial proof framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  Plaintiff has filed a memorandum of law in opposition to the Motion.

> **B.**      **Background.**[2]
>
>> **1.**      *Plaintiff's Work Record at the City from 1998 - 2001.*

In September 1998, the City hired Sullivan as an Unskilled Laborer in its Public Works Department, reporting directly to Elmore.  (Sullivan Decl., ¶ 1; Sullivan Dep., at 27-28.)[3]  After completing his six month probationary period, Sullivan advanced to Public Service Worker I ("PSWI") on Elmore's recommendation.  (Sullivan Decl., ¶ 1; Plaintiff's Exh. A.)[4]  As a PSWI, Sullivan's duties included operating a chipper truck, operating a tractor, cutting grass and weeds, and the like.  (Sullivan

---

[2]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir.  2004); *Johnson v. Governor of State of Fla.*, 415 F.3d 1214, 1217 (11th Cir. 2005) (on summary judgment, court must view record and draw all reasonable inferences in light most favorable to  nonmoving party).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor.

[3]      Sullivan's Declaration contradicts his deposition testimony by averring that Elmore "did not become a supervisor until November 2001."  (Sullivan Decl., ¶ 4.)  By contrast, in his deposition Sullivan testified that Elmore interviewed him, became Sullivan's immediate supervisor at the outset of Sullivan's employment, and has always been Sullivan's supervisor.  (Sullivan Dep., at 28.)  The Court need not resolve this discrepancy, as it is not material to the legal issues presented in the Motion for Summary Judgment.

[4]      Plaintiff's Exhibit A is a copy of a form recommending his promotion, and is one of several exhibits that plaintiff submitted on summary judgment without authentication or verification.  Generally, courts ruling on Rule 56 motions may consider only admissible evidence.  *See Denney v. City of Albany,* 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form.") (citation omitted).  Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that they can be reduced to admissible, authenticated form at trial.  *Bozeman v. Orum*, 199 F. Supp.2d 1216, 1222 (M.D. Ala. 2002).  Those requirements were not followed as to this exhibit.  Nonetheless, there appears to be no dispute that "Plaintiff's Exhibit A" is in fact a true and accurate copy of the form; as such, it is apparent that this document can be reduced to admissible, authenticated form at trial, and the Court will consider it on that basis.  The same rationale applies to other unverified, unauthenticated exhibits in the record.

Dep., at 15, 71-72.)

Between 1998 and July 2001, Sullivan had no major problems on the job and no substantial clashes with Elmore. (Sullivan Decl., ¶ 4.) Indeed, the Satsuma City Council approved a 5% merit pay increase for Sullivan in December 2000. (Plaintiff's Exh. B.)[5] Moreover, written "Service Rating Reports" prepared by Elmore and other City officials consistently rated his performance "high quality service" during 2000 and 2001. (*Id.*)

As of 2002, Sullivan was one of six PSWIs working for the City, including three African-American employees and three Caucasian employees. (Elmore Aff., at 1.) The Public Works Department also included an African-American PSWII and a Caucasian part-time PSWI. (*Id.*)

> 2.    *The Acting Supervisor Issue and the April 8 Confrontation.*

From time to time, Elmore would have occasion to be absent and unavailable to supervise the Public Works Department because of vacation, sick leave, or the like. In those intermittent and infrequent circumstances, he would designate a PSWI to serve as "acting supervisor." (Sullivan Dep., at 31.) An "acting supervisor" receives no increase in pay or benefits; however, he is responsible for ensuring that Public Works employees do their jobs in the supervisor's absence. (Sullivan Dep., at 33-34, 58.) The position is not considered a promotion within the Department. (Miller Aff., at 1.) Beginning in the summer of 2001, Elmore selected a white Unskilled Laborer named John Sexton,[6] who had been hired in July 2001 and was still in his probationary period, to be acting supervisor. (Sullivan Decl., ¶¶ 3, 5; Sullivan Dep., at 31-32.)[7]

---

[5]    It appears that Sullivan was the only one of the City's approximately six PSWIs to be selected for a merit raise at that time. (*Id.*)

[6]    Plaintiff's filings interchangeably refer to this individual as "Sexton" and "Sexon." (*Compare* Sullivan Decl., ¶¶ 6-7 ("Sexton") *with* ¶¶ 3-5 ("Sexon").) The Court surmises that the former spelling is correct.

[7]    Defendants filed a Motion to Strike (doc. 37) challenging statements in Sullivan's Declaration that Sexton was named acting supervisor in summer 2001, while still a probationary employee. (Sullivan Decl., ¶¶ 5, 6, 7, 10.) According to defendants, these averments must be stricken because they contradict Sullivan's sworn deposition testimony. But the deposition excerpt on which the Motion to Strike hinges does not unequivocally state that Sexton was never acting supervisor during the

Sullivan balked that Sexton was supervising his work in Elmore's absence, inasmuch as Sexton was a newly hired probationary worker while Sullivan was an experienced PSWI with three years of service.  (Sullivan Decl., ¶ 6.)  When Sullivan complained about this arrangement,[8] Elmore began assigning Sullivan to be acting supervisor, but continued to entrust the office keys to Sexton.  (*Id.*, ¶ 7.)  The practical effect was that when Sullivan was acting supervisor, he still had to ask Sexton to let him into the office because Sexton controlled the keys.  (Sullivan Dep., at 31, 33.)  Sullivan was acting supervisor until April 11, 2002, at which time Elmore allocated acting supervisor duties to PSWIs on a rotating basis.  (*Id.* at 58.)

Sullivan continued to harbor discontent with this issue, and particularly Sexton's custody of the office keys when Sullivan was acting supervisor.  (Sullivan Decl., ¶ 10; Sullivan Dep., at 37.)  At lunchtime on April 8, 2002, several hours after he attended a meeting relating to various job performance issues and unveiling Elmore's decision to rotate acting supervisor duties among PSWIs, Sullivan complained to Elmore again about the acting supervisor issue.  (Elmore Dep., at 24, 31-32; Sullivan Decl., ¶¶ 10-11.)  According to Elmore's contemporaneous written account of that meeting,

---

second half of 2001; rather, it simply provides that the acting supervisor <u>rotation</u> began in April 2002 and that during some unspecified period ending in April 2002, Sullivan "served as a temporary supervisor exclusively when Mr. Elmore was out," whatever that means.  (Sullivan Dep., at 57-58.)  The ambiguities in the deposition passages leave sufficient uncertainty that Sullivan's Declaration cannot be rejected as a sham.  *See Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) (affidavit is a sham only when it contradicts, without explanation, "clear answers to unambiguous questions"); *Brassfield v. Jack McLendon Furniture*, 953 F. Supp. 1424, 1430 (M.D. Ala. 1996) ("sham affidavit" rule bars only affidavit statements that are "inherently inconsistent" with earlier deposition testimony).  Besides, elsewhere in his deposition, Sullivan testified that Sexton had the office keys in 2001 and that Sullivan complained about the acting supervisor issue in 2001.  (Sullivan Dep., at 31.)  This testimony tends to bolster his Declaration that Sexton had served as acting supervisor during that interval and to undercut any contention that the Declaration is a mere sham.  The Motion to Strike is **denied**.

[8]      The record is silent as to the exact timing and details of this discussion between Sullivan and Elmore.  Certainly, there is no indication that Sullivan advised Elmore during this initial conversation that he believed Elmore was doling out acting supervisor duties in a racially biased manner.

Sullivan argued that he should have that role because of his seniority.  (Plaintiff's Exh. D.)[9]  Elmore's

memo states, "He also said that he thought it was because he was black," indicating that Sullivan's

complaint of April 8 was effectively one of racially discriminatory work assignments as to acting

supervisor responsibilities.[10]

3.      *Disciplinary Action from April 2002 to October 2002.*

On March 7, 2002, Elmore recommended that Sullivan receive a merit raise.  (Plaintiff's Exh.

C.)[11]  As grounds for this recommendation, Elmore wrote that Sullivan "does a good job with the

chipper truck," that he "is willing to go above and beyond the call of duty," that he "has shown much

---

[9]      Elmore testified that he typed this written account on the same day that the meeting in question occurred.  (Elmore Dep., at 31.)

[10]      Sullivan's testimony diverges from Elmore's on this critical point.  In his deposition, Sullivan flatly denied mentioning race during his April 8 conversation with Elmore.  (Sullivan Dep., at 57.)  Indeed, Sullivan testified that the first time he indicated to Elmore that he believed acting supervisor assignments were racially biased occurred "[m]ore like weeks" after April 8.  (*Id.*)  Sullivan further testified that as of April 15, 2002, he had not told Elmore or any other City official that he believed his race was the reason for defendants' alleged adverse treatment of him.  (*Id.* at 59-60.)  Additionally, Sullivan indicated that he had never complained to Elmore of race discrimination before the latter completed his August 2002 performance evaluation.  (*Id.* at 82.)  Finally, Sullivan testified that he had never complained of race discrimination to defendants before filing his EEOC Charge in October 2002.  (*Id.* at 85.)  In a summary judgment affidavit dated August 22, 2005, Sullivan backtracked, averring that he did not recall whether he had told Elmore on April 8 that his non-selection for acting supervisor was because of his race, but that he did not dispute that he had done so because that is how he felt.  (Sullivan Decl., ¶ 11.)  Such statements are irreconcilable with Sullivan's unequivocal deposition testimony.  A litigant ordinarily cannot utilize an affidavit on summary judgment to contradict his earlier sworn testimony.  *See Van T. Junkins*, 736 F.2d at 657 ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony.").  Such is the case here; therefore, the Court will not consider the last sentence of paragraph 11 of Sullivan's Declaration.

[11]      Elmore nominated only one other Public Works Department employee, Chris Smyly, for a merit increase for 2002.  (*Id.*)

-5-

improvement," and that he "com[es] up with ideas which help the Dept. and tak[es] responsib[ility]." (*Id.*)

On the morning of April 8, 2002, prior to any complaints by Sullivan regarding alleged racially biased treatment, Sullivan was summoned to meet with Elmore and City Council members Larry Landrum and Bill Black. That meeting covered the following topics: (i) a new job duty for Sullivan to operate the leaf vacuum; (ii) a requirement that Sullivan submit a list of trash and leaf piles to Elmore each morning; (iii) a citizen complaint that Sullivan remained in the chipper truck while inmates whom he supervised picked up limbs and leaves;[12] and (iv) Elmore's position that Sullivan had failed to complete required paperwork as acting supervisor and Elmore's plan to rotate PSWIs as acting supervisor going forward. (Plaintiff's Exh. D; Sullivan Dep., at 36-43.)

During the afternoon of April 8, a series of significant events occurred. As mentioned *supra*, Sullivan approached Elmore at lunchtime and complained that the acting supervisor duties were being stripped from him because of his race. At the end of this encounter, Sullivan became agitated, stated that he was not going to talk to Elmore because it made his blood pressure increase, and walked away. (Plaintiff's Exh. E; Elmore Dep., at 31-32.)[13] Later that afternoon, Elmore prepared a memorandum to Black purporting "to withdraw the request [he] put in for Shester Sullivan to have a merit raise" six weeks earlier. (Plaintiff's Exh. E.) Elmore's memo explains that this decision was based on Sullivan's behavior during the second April 8 meeting, and does not identify any other reason.[14] Elmore had

---

[12]     Sullivan was assisted in the chipper vehicle by two inmates, who were to exit the truck, pull limbs up to it, and run them through the chipper. (Sullivan Dep., at 15-16.)

[13]     Neither party has offered testimony of hostility between Elmore and Sullivan during their second April 8 discussion. However, plaintiff has included in the record an April 8 letter from Elmore to Black describing Sullivan's alleged statement declining to talk to Elmore because it made his blood pressure go up. (Plaintiff's Exh. E.) Sullivan acknowledges that he made such a statement. (Sullivan Dep., at 85.) As there is no dispute that Elmore's written account accurately describes those events, the Court will accept Plaintiff's Exhibit E for purposes of this Rule 56 analysis.

[14]     In his deposition, Elmore testified that he rescinded the recommendation for a merit increase because of Sullivan's "job performance and general attitude." (Elmore Dep., at 58.) Elmore further testified that he took action because Sullivan "got mad and stumped [*sic*] off" and had "a little

never previously rescinded a recommendation of a merit increase for any employee.  (Elmore Dep., at 62.)

In the weeks following the April 8 meeting, Elmore issued a spate of memoranda directly or indirectly relating to Sullivan.  (Sullivan Decl., ¶ 14.)  For example, on April 11, 2002, Elmore sent a memo to City officials regarding the rotating acting supervisor position, in which he stated that Sullivan had not performed well in that capacity, inasmuch as he had failed to turn in required paperwork and to report changed work assignments.  (Plaintiff's Exh. F.)  Sullivan maintains that Elmore fabricated these criticisms.  (Sullivan Decl., ¶ 14.)  Five days later, Elmore circulated a detailed memorandum to Public Works employees regarding work hours, assignments, radio contact, safety equipment, inmate rules, lunch breaks, equipment inspections, and the like.  The memo stated that employees could be disciplined if they failed to heed these rules.  (Plaintiff's Exh. F.)  Sullivan suggests that Elmore promulgated these requirements in an attempt to "paper" his file or set him up for discipline.  (Sullivan Decl., ¶ 14.)   On April 17, 2002, Elmore sent a memo to City officials indicating that he had met with all Public Works employees "concerning work procedures and attitudes," which Sullivan construed as being directed at him.  (Plaintiff's Exh. F.)

On April 26, 2002, Sullivan met with City Mayor William Bush and Elmore at Sullivan's request to follow up on the April 8 meetings.  During that meeting, Mayor Bush advised Sullivan that the City "would not discuss it anymore at this time since [Sullivan] had gotten his lawyer involved." (Plaintiff's Exh. F.)  It is unclear from the record whether any substantive discussion transpired at the April 26 meeting.

The next event of note was a meeting on May 29, 2002 between Sullivan and Elmore.  The two spoke about a variety of matters, including the following: (a) a report that Sullivan had questioned Elmore's actions to an inmate on a work crew; (b) Sullivan's dissatisfaction with the computation of leave when he left work early one day; and (c) Sullivan's unhappiness that Mayor Bush would not meet with Sullivan's attorney.  (Plaintiff's Exh. F.)  Elmore documented the meeting in a written

---

temper tantrum" on April 8, but also because of other unspecified events during the six-week period between Elmore's submission of the recommendation and its rescission.  (*Id.* at 60-62.)

memorandum, which was placed in Sullivan's personnel file.  (*Id.*)  Sullivan does not identify any

inaccuracies in the memo, nor does he deny the conduct for which he was reprimanded.

In August 2002, Sullivan received a job performance evaluation.  Although the parties

neglected to include a copy of this evaluation in the record or to provide details as to its substance, the

uncontroverted evidence is that Sullivan's August 2002 rating was his lowest in at least two years, and

that it was not accompanied by any merit increase.  (Sullivan Decl., ¶ 13.)

> 4.      *The EEOC Charge and Ensuing Developments.*

On or about October 7, 2002, Sullivan filed a Charge of Discrimination with the EEOC alleging

discrimination on the basis of his race.  As evidence of alleged discriminatory treatment, the Charge

alleged that Sullivan faced less favorable terms and conditions of employment than Sexton, that Sullivan

had to ask Sexton for office keys even when Sullivan was acting supervisor, and that Sullivan received

an unfavorable performance evaluation in August 2002.  (Plaintiff's Exh. G.)[15]  An amendment to the

Charge filed in or around June 2003 added an allegation of retaliation, to-wit: "On or about April 29,

2003, I learned that I had been denied a merit increase.  I believe that I was denied this merit increase

in retaliation for complaining of race discrimination."  (*Id.*)

Sullivan complains that the City retaliated against him in several respects after he filed his EEOC

Charge.  Specifically, he indicates that his vehicle was damaged in a City parking lot via a broken

windshield and a punctured tire sometime "[f]ollowing the filing of [his] EEOC complaint."  (Sullivan

Decl., ¶ 16.)  The temporal proximity of these events to the EEOC Charge is unclear.[16]  Nonetheless,

-------

[15]      The copy of the Charge in the record was signed by Sullivan on November 25, 2002, and was stamped "Received" by the EEOC's Birmingham office two days later.  The body of the Charge includes the following typewritten legend: "+ (Amended charge - original charge filed October 7. 2002)."  (Plaintiff's Exh. G.)  The record lacks a copy of the October 7 charge or any explanation of how the November charge modified its predecessor.  Because defendants have argued neither that the Charge was untimely nor that any of plaintiff's claims herein were not properly exhausted, the Court will not explore this question further.

[16]      Elmore's deposition transcript references a written police report concerning the damage to Sullivan's vehicle.  (Elmore Dep., at 65-66.)  Such report would likely bear a date; however, that report is not part of the summary judgment record.

-8-

the record reflects that Sullivan notified Elmore that an object had fallen out of a tree and cracked his windshield on City property, and that Elmore advised Sullivan to file a report for insurance purposes. (Elmore Dep., at 66-67.)[17]  Sullivan did so, but the City's insurance denied the claim, as a result of which Sullivan had to pay for the windshield himself.  (Bush Dep., at 36-37; Sullivan Dep., at 87-88; Sullivan Decl., ¶ 18.)  Sullivan and Elmore are unaware of the City reimbursing any employee for windshield damage on City property.  (Sullivan Dep., at 87-88; Elmore Dep., at 67.)  As for the tire, the uncontroverted evidence is that Sullivan never advised any City official that his tire had been punctured, much less that he believed it was an intentional act of vandalism.  (Elmore Dep., at 66; Bush Dep., at 36-37; Sullivan Dep., at 89.)  Sullivan did not know the source of the nail that damaged his tire, and has no knowledge that the City has ever reimbursed any employee for a punctured tire. (Sullivan Dep., at 89-90.)

In addition to vehicle damage, Sullivan complains that at an unspecified time after he filed an EEOC Charge, Elmore posted a sign in the employee parking lot stating, "Your Attitude Directly Reflects Your Job Performance."  (Sullivan Decl., ¶ 17; Plaintiff's Exh. H.)  The uncontroverted evidence is that Elmore posted this sign "to address all employees of the procedures and job performance issues" and that he had met with all Public Works employees to discuss these attitude and performance concerns.  (Elmore Aff. II, at 1; Plaintiff's Exh. F.)  At or around that same unspecified time, Sullivan contends that he observed Sexton drawing or carving racist symbols and imagery into a picnic table where Public Works employees and inmates eat lunch.  (Sullivan Decl., ¶ 18; Sullivan Dep., at 95.)[18]  When Sullivan's attorney reported this matter, the City promptly painted over the graffiti and brought in the local District Attorney's Office to investigate. (Sullivan Dep., at 97; Bush Dep., at 33-34.)  During that investigation, Mayor Bush himself interviewed at least four employees, as well as several inmates who served on work crews.  (Bush Dep., at 34.)  Sexton denied any

---

[17]     Sullivan explains that his windshield was broken not by a person but by a "green cockabull," an enigmatic item that "will be in trees."  (Sullivan Dep., at 89.)

[18]     A grainy black-and-white photograph accompanying plaintiff's summary judgment submission depicts what appear to be hoods and a gallows carved or drawn into a wooden surface. (Plaintiff's Exh. H.)

wrongdoing.  (*Id.* at 34-35.)  Viewed in the light most favorable to plaintiff, the evidence is that Sullivan

and several other individuals informed investigators that Sexton had made the drawings at issue;

however, neither Sexton nor any other City employee was disciplined because the investigation was

inconclusive.  (Sullivan Dep., at 98-99; Sullivan Decl., ¶ 18; Bush Dep., at 35-36.)[19]

> 5.      *The Probable Cause Determination and Ensuing Developments.*

At the conclusion of the EEOC's investigation into Sullivan's Charge, it issued a determination

finding probable cause that the City had engaged in unlawful retaliation for his complaint of race

discrimination by withdrawing the merit raise recommendation in spring 2002.  (Sullivan Decl., ¶ 19.)[20]

The record does not specify the date of this determination.

On April 12, 2004, apparently "a very short period of time" after the EEOC determination, the

City attempted to implement a 20-day disciplinary suspension against Sullivan based on a verbal

altercation with Elmore.  (Sullivan Decl., ¶ 20.)  According to Sullivan, this incident began when Elmore

asked Sullivan's wife to testify against him in an unidentified proceeding.  (Sullivan Dep., at 99.)  When

Sullivan learned of this, he confronted Elmore.  In Sullivan's words, Elmore made "a little smart

statement," after which "one word led to another."  (*Id.* at 100.)  Elmore's account, which Sullivan has

not refuted, is that Sullivan was "hollering and screaming" at him and that Sullivan told him to "come on

out here and be a man."  (Elmore Dep., at 43-44.)[21]  This incident was reported to Mayor Bush, who

conducted a pre-disciplinary conference with Elmore and Sullivan.  Evidently, Sullivan admitted to

Mayor Bush that he had told Elmore that he would "take care of the issue," which Mayor Bush

construed as a threat of violence.  (Bush Dep., at 13, 24-25.)  On that basis, Mayor Bush ordered a

20-day suspension for Sullivan.  (*Id.*)  This suspension was subsequently rescinded by the Mobile

---

[19]      A written report of the graffiti investigation apparently exists (Bush Dep., at 33-34);
however, it has been omitted from the summary judgment record.

[20]      In that regard, the EEOC undoubtedly prepared a written cause determination, which
the parties elected not to include in the summary judgment record.

[21]      Elmore testified that he prepared a written memorandum of this incident for the
Mayor's review.  (Elmore Dep., at 45.)  Once again, however, that contemporaneous memo is not part
of the Rule 56 record.

County Personnel Board, with full restoration of all back pay and time missed, on the grounds that Mayor Bush had "pre-typed" a letter of suspension prior to the hearing, and that Elmore had been involved in the disciplinary process.  (Sullivan Decl., ¶¶ 21-24; Bush Dep., at 27.)[22]  In light of the Personnel Board's ruling, the suspension was rescinded, there is no record of such a suspension in Elmore's file, and his pay and benefits are fully intact.  (Miller Aff., at 1.)

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

---

[22]    The Personnel Board's written decision includes specific determinations that the pre-disciplinary action notice given to Sullivan failed to identify the reasons for the contemplated suspension, that the "pre-typed" suspension letter is evidence that Mayor Bush decided to suspend Sullivan before hearing his side of the story, and that the complaining employee (Elmore) should not have been involved in the decision making process.  (Miller Aff., at Exh. A.)  Based on these findings, the Personnel Board declared Sullivan's suspension "to be VOID and of no force and effect," and restored him to active duty with full back pay.  (*Id.*)

Furthermore, "unsupported speculation ... does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."

*Cordoba v. Dillard's, Inc.*, --- F.3d ----, 2005 WL 1838530, *9 (11th Cir. Aug. 4, 2005); *see also Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("conclusory allegations without specific supporting facts have no probative value" in summary judgment analysis).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

## III.   Analysis.

Sullivan's Complaint alleges Title VII claims against the City for race discrimination and retaliation, as well as an equal protection claim against Elmore under 42 U.S.C. § 1983 based on race discrimination and retaliation theories. The law is clear that both the Title VII and § 1983 causes of action are governed by the same familiar Title VII framework. *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1314 n.6 (11th Cir. 2000) (noting that substantive law and proof requirements of Title VII and § 1983 are the same for claims alleging intentional employment discrimination based on race by state actors); *Thigpen v. Bibb County, Ga., Sheriff's Dep't*, 223 F.3d 1231, 1239 (11th Cir. 2000) (confirming that Eleventh Circuit evaluates § 1983 race discrimination claims supported by circumstantial evidence using *McDonnell Douglas*); *Cross v. State of Alabama*, 49 F.3d 1490, 1507-08 (11th Cir. 1995) (stating that when § 1983 is used as a parallel remedy for violation of Title VII the elements of both causes of action are the same).[23] The Court will consider plaintiff's race

---

[23]   That said, the Court recognizes that there may be situations in which different standards apply to Title VII claims and Equal Protection claims. *See Snider v. Jefferson State Community College*, 344 F.3d 1325, 1328 (11th Cir. 2003) ("Title VII originally was created to reach conduct that the Constitution did *not* reach; and the statute and Constitution are not always concurrent."); *Bass v. Board of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1103 (11th Cir. 2001) ("claims

discrimination and retaliation claims separately.

### A.     *The McDonnell Douglas Standard.*

Absent direct evidence of discrimination, which has neither been presented nor argued here, Sullivan must make a showing of circumstantial evidence which satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this familiar, tripartite burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race discrimination.  If he does so, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for [the adverse employment action]. ... If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997) (citations omitted).[24]  A plaintiff may establish pretext "either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief."  *Hall v. Alabama Ass'n of School Boards*, 326 F.3d 1157, 1166 (11th Cir. 2003); *see also Wilson*, 376 F.3d at 1088 (plaintiff may prevail "by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination").  The ultimate burden of persuasion remains with the plaintiff.  *See E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002).

### B.     *Race Discrimination Claims.*

The Complaint alleges that defendants discriminated against Sullivan on the basis of his race in the following respects: (a) not permitting him to have office keys when serving as acting supervisor; (b) giving him less desirable work assignments than his white co-workers; (c) allowing other workers to be

---

under Title VII and the Equal Protection Clause are distinct").

[24]     Sullivan's burden of establishing a *prima facie* case is not heavy.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one"); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (plaintiff's "burden in proving a *prima facie* case is light").

acting supervisor; and (d) exposing him to racially hostile graffiti on the picnic table.  (Complaint, ¶¶ 7-8.)  In their Rule 56 Motion, defendants contend that they are entitled to judgment as a matter of law on each of these race discrimination claims.

> ### 1.   The Race Discrimination Causes of Action Are Abandoned.

In response to the Motion attacking his race discrimination claims, plaintiff says nothing.  Although plaintiff's counsel addresses the retaliation claims at length, no analysis or argument of any kind is offered with respect to the race discrimination claims.  (Plaintiff's Corrected Response (doc. 33), at 1-9.)  By all appearances, plaintiff has made a strategic decision to abandon his race discrimination claims so that he can focus on his retaliation theory.

Plaintiff's silence in these circumstances prompts the legal conclusion that the race discrimination claims have been abandoned.  Indeed, the Eleventh Circuit has held that a district court may "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment."  *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (party's failure to brief and argue issue before district court is ground for declaring it abandoned); *McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (noting that a claim may be considered abandoned when it is included in the complaint, but plaintiff fails to present argument concerning this claim to the district court).[25]  This result follows from the well-worn principle that "the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  *Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997); *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 892 (Fed. Cir. 1999) (discussing "unremarkable

_____

[25]     Such holdings are not unique to the Eleventh Circuit.  *See generally Laborers' Int'l Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions."); *Ali v. Brown*, 998 F. Supp. 917, 924 (N.D. Ill. 1998) (where complaint alleged discrimination on basis of several protected characteristics, but summary judgment brief pursued only Title VII race claim, plaintiff's failure to support remaining claims with legal argument or authority waived them).

proposition that assertions made in the pleadings ..., but not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion"). By foregoing the opportunity to rebut or otherwise respond to defendants' summary judgment arguments on the race discrimination claims, plaintiff has abandoned that basis for relief.[26]

>    2.    *Alternatively, the Race Discrimination Claims Fail on the Merits.*

Even if plaintiff's race discrimination claims were not abandoned, defendants would nonetheless be entitled to summary judgment. A plaintiff can establish a *prima facie* case of disparate treatment by showing the following elements: (i) he belongs to a racial minority; (ii) he was subjected to an adverse job action; (iii) his employer treated similarly situated employees outside his protected class more favorably; and (iv) he was qualified to do the job. *See, e.g., Wilson*, 376 F.3d at 1091; *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003). "A plaintiff does not shift the burden to the defendant under *McDonnell Douglas* merely by stating that he was fired or treated unfavorably. *McDonnell Douglas* requires the plaintiff to establish a *prima facie* case which includes identifying an individual who replaced him or was treated better than he was who was not a member of his protected class." *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005). "Only after the plaintiff has made his *prima facie* case does the burden shift to the defendant." *Id.*

>    a.    *Work Assignments.*

To the extent that Sullivan's race discrimination claims are based on the acting supervisor assignment or day-to-day job duties (*e.g.*, operation of a backhoe versus operation of a chipper truck), plaintiff cannot show a *prima facie* case of race discrimination because neither of those personnel

---

[26]    To the extent that plaintiff would shift to the Court the burden of formulating and presenting his summary judgment arguments on the race discrimination claims, such a gambit is impermissible. After all, "the court is under no duty to exercise imagination and conjure what a plaintiff might have alleged, but did not, and do counsel's work for him or her." *Pinto v. Universidad De Puerto Rico*, 895 F.2d 18, 19 (1st Cir. 1990); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment"); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) ("[i]t is not for the court to manufacture arguments on Plaintiff's behalf" in response to a summary judgment motion).

decisions qualifies as an "adverse employment action" for Title VII purposes.

The law is clear that "not all conduct by an employer negatively affecting an employee constitutes adverse employment action" under Title VII. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11ᵗʰ Cir. 2001); *see also Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1181 (11ᵗʰ Cir. 2003) ("not every unkind act is sufficiently adverse" to qualify as an adverse employment action) (citation omitted). Rather, an employment action meets this threshold only when it "results in some tangible, negative effect on the plaintiff's employment" through "a serious and material change in the terms, conditions or privileges of employment ... as viewed by a reasonable person in the circumstances." *Shotz*, 344 F.3d at 1181-82 (citations omitted); *see also Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1118 (11ᵗʰ Cir. 2001) (explaining that "some threshold level of substantiality" must be satisfied for conduct to constitute an adverse employment action, inasmuch as not everything that makes employee unhappy is actionable); *Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11ᵗʰ Cir. 2004) (no adverse employment action where complained-of conduct had no effect on plaintiff's employment status, such that it was neither objectively serious nor sufficiently tangible). To constitute an "adverse employment action" for Title VII purposes, "the employer's action must impact the terms, conditions or privileges of the plaintiff's job in a real and demonstrable way," such that a reasonable person in the circumstances would have viewed it as "a **serious and material** change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239.

Neither the acting supervisor assignment nor Sullivan's day-to-day duties on the chipper, the tractor or the leaf vacuum affected his pay, benefits, or opportunities for advancement within the Public Works Department. Rather, these acts fall squarely under the heading of work assignments. The Eleventh Circuit has expressed profound skepticism at the ability of changes in job duties to rise to the level of adverse employment actions when unaccompanied by tangible harm, except in "unusual instances" where the change is sufficiently substantial and material. *Davis*, 245 F.3d at 1244-45. "In the vast majority of instances ... an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title

VII's anti-discrimination clause." *Id.* at 1245.  A contrary ruling would authorize a flood of work assignment claims that would place federal courts in the untenable and inappropriate position of acting as a "super-personnel department" to second-guess the employer's business judgment and expertise in balancing limited personnel resources with the important and challenging tasks expected of them by the public.  *See id.* at 1244.  Plaintiff has not alleged, and the record does not reflect, any tangible harm or other factors that might support an "unusual instance" determination here.  As such, plaintiff's grievances about his assigned duties and his removal from acting supervisor status are not actionable under Title VII, as a matter of law.  *See id.* at 1244-45 (no adverse employment action where plaintiff complained about temporary removal from officer-in-charge designation, where officer in charge supervises others in sergeant's absence).

*b.*     *Racist Graffiti.*

With regard to plaintiff's claim about racially themed graffiti found on a picnic table on a single occasion, the uncontroverted evidence is that the City investigated Sullivan's allegations promptly when his attorney brought them to the City's attention.  Further, the record shows that the offensive drawings or carvings were removed immediately and that there has never been a recurrence of them in plaintiff's workplace.  The allegation that one of plaintiff's co-workers drew racist symbols on a table on a single occasion cannot give rise to employer liability under Title VII.  For starters, although it was undoubtedly offensive, such a solitary, isolated occurrence fails to satisfy the "severe and pervasive" threshold required to be redressable under Title VII.  *See Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1280 (11th Cir. 2003) (Title VII hostile environment claim requires a showing that harassment was sufficiently severe or pervasive to create discriminatorily abusive work environment); *see also Gillis v. Georgia Dept. of Corrections*, 400 F.3d 883, 888 (11th Cir. 2005) (recognizing that Title VII is "neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace").  Moreover, these events are not actionable given the undisputed evidence that the City responded promptly and effectively to plaintiff's concerns of racial harassment.  *See generally Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002) ("Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly

-17-

liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action.")[27] Defendants are entitled to summary judgment on this claim.

<em>c.</em>    <em>Office Key.</em>

Plaintiff's claim that defendants discriminated against him on the basis of race by vesting the office key in the hands of a white employee, rather than Sullivan, cannot survive Rule 56 scrutiny for two distinct reasons.  First, the Court cannot find that assigning custody of an office key to another employee is an "adverse employment action" implicating Title VII.  To the contrary, this is exactly the sort of trifling, minor workplace slight that the Eleventh Circuit has taken pains to excise from the ambit of Title VII.  *See, e.g., Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (explaining that Title VII does not make actionable "the ordinary tribulations of the workplace").[28] Second, the undisputed evidence is that two PSWIs, including John Sexton (who is white) and Nathan Tate (who is black), were given office keys to safeguard.  (Elmore Aff. II, at 1; Sullivan Dep., at 93.) Under these circumstances, no reasonable factfinder could conclude that Sullivan was deprived of an office key because of his race because one of the two PSWIs given such a key was black. Accordingly, to the extent that plaintiff would propound race discrimination claims against defendants

---

[27]    The Court understands that Sullivan believes the City should have punished Sexton for his alleged role in the harassment.  However, the law is clear that a plaintiff cannot proceed under Title VII simply because he is dissatisfied with the particular remedy chosen by the employer to end the harassment, where that remedy has in fact been successful.  *See Walton*, 347 F.3d at 1288 ("where the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow").  A victim of harassment is entitled to remedial action reasonably calculated to end the harassment, not to a specific remedial action of that person's choosing.  Thus, plaintiff's subjective belief that Sexton should have been disciplined is of no consequence to the hostile work environment analysis.

[28]    The Eleventh Circuit has recently explained in an unpublished decision that this kind of petty affront against an employee simply cannot satisfy the threshold for an actionable Title VII claim. *See Benefield v. Fulton Co., GA*, 2005 WL 1006847, *3 (11th Cir. Apr. 29, 2005) (no "adverse employment action" for Title VII purposes where employer discontinued employee's use of company car and pager, transferred her staff, eliminated certain job responsibilities, denied her reimbursement for certain job-related expenses, transferred her laterally, declined to give her light duty after she injured her shoulder, and the like, because none of these actions meet requisite substantiality threshold).

-18-

based on the fact that he was not entrusted with a key when serving as acting supervisor, he cannot proceed to trial on such a theory.

### C.    Retaliation Claims.

The Court having granted summary judgment to defendants on the race discrimination causes of action, the only remaining claims sound in retaliation theories.  In particular, the Complaint alleges that defendants retaliated against Sullivan after he complained of race discrimination in the following respects: (i) rescission of the merit pay increase recommendation; (ii) the failed 20-day suspension for insubordination in April 2004; (iii) unfavorable performance evaluations after April 2002; and (iv) causing and/or allowing damage to plaintiff's vehicle and posting a parking lot sign regarding employee attitudes.  (Complaint, ¶¶ 9-14.)[29]

### 1.    Retaliation Standard.

In addition to prohibiting employment discrimination on the basis of race, Title VII bars an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *see also Gupta*, 212 F.3d at 586 ("Retaliation is a separate violation of Title VII.").[30]  Plaintiff offers no direct evidence of retaliation, but rather grounds this cause of action

---

[29]       In their summary judgment brief, defendants devote substantial energy to several additional allegations of retaliation that were not presented in the Complaint.  In particular, defendants offer facts and arguments regarding retaliation claims arising from Sullivan's removal from the chipper truck assignment, his lack of "operator" classification and his concomitant depressed compensation, a "light duty" assignment after a work-related injury, and a March 2005 performance evaluation. (Defendants' Brief, at 5, 7-8, 13-14.)  None of these claims are presented in the Complaint, so it does not appear that any of them are part of this lawsuit.  Even if they were, plaintiff's brief and supporting materials make no mention of any of these allegations.  Accordingly, pursuant to the rationale of Section III.B.1., *supra*, the Court concludes that these aspects of Sullivan's retaliation claim (if they were ever part of this case at all) have been abandoned, and will not discuss them further herein.

[30]       The merits of the retaliation claim are distinct from those of the underlying race discrimination claim.  *See Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) ("retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed").

exclusively on circumstantial proof.  In the absence of direct evidence, Title VII retaliation claims turn

on precisely the same traditional *McDonnell Douglas* burden-shifting principles as do other Title VII

claims.  *See Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).  Thus, a

plaintiff bears the burden of establishing a *prima facie* case of retaliation by showing that (1) he

engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there

was a causal link between his protected activity and the adverse action.  *See Stavropoulos*, 361 F.3d

at 616; *Shotz*, 344 F.3d at 1180; *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir.

2002); *Bass*, 256 F.3d at 1117.

If a plaintiff makes a *prima facie* showing, then the employer must articulate a legitimate, non-

retaliatory reason for the challenged employment decision.  *See Brochu*, 304 F.3d at 1155;

*Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  If the defendant produces

legitimate reasons for the adverse employment action, then the plaintiff must show that defendant's

stated reasons are pretexts for retaliation through the same mechanisms outlined in Section III.A.,

*supra*.  *See Brochu*, 304 F.3d at 1155.

2.      *Events of April 8, 2002 to August 2002.*

Sullivan maintains that defendants retaliated against him for complaining about race

discrimination by withdrawing a recommendation for a merit pay increase on April 8, 2002, issuing a

stream of memoranda criticizing his performance or subjecting him to more stringent job requirements in

April and May 2002, and giving him his first less-than-stellar evaluation in over two years in August

2002.

Defendants contend that they are entitled to summary judgment on these claims because plaintiff

cannot show that he engaged in protected activity predating any of these allegedly retaliatory actions.

In that regard, defendants rely on Sullivan's deposition testimony that he did not raise the subject of

racial bias to Elmore on April 8, and that the first time he ever complained of race discrimination to

defendants was when he filed his EEOC Charge in October 2002.  (Sullivan Dep., at 57, 59-60, 82,

85.)  Defendants reason that in the absence of protected activity (*e.g.*, an internal complaint of race

discrimination), they cannot be held liable on a retaliation theory for their actions between April 2002

and August 2002.

Defendants are correct that plaintiff must show protected activity as part of his *prima facie* case. However, the fundamental defect in defendants' argument is that this case is before the Court on a Motion for Summary Judgment, meaning that all evidence must be viewed in the light most favorable to Sullivan and all justifiable inferences must be drawn in his favor. *See Johnson*, 405 F.3d at 1217. Viewed most favorably to plaintiff, the record shows that Sullivan <u>did</u> complain to Elmore of race discrimination on April 8, 2002 and that, mere hours later, Elmore abruptly withdrew his recommendation for a merit pay increase for Sullivan, citing Sullivan's conduct during the meeting in which he lodged his racism complaint. In particular, a contemporaneous memorandum prepared by Elmore to document the April 8 conversation reflects that Sullivan "said that he thought it was because he was black" (Plaintiff's Exh. D.), referring to the acting supervisor assignments and key vouchsafing in favor of Sexton (a white employee). Given this evidence, the Court is constrained to find at the Rule 56 stage that plaintiff has presented sufficient evidence of protected activity in April 2002 to satisfy that element of his *prima facie* case.[31] Defendants having offered no other legal basis for seeking summary judgment on these retaliation claims, the Motion for Summary Judgment is **denied** as to the retaliation claims arising from the rescission of the pay increase, the ensuing memoranda by Elmore, and the poor

---

[31] That said, the Court is troubled that a plaintiff can satisfy the protected activity threshold even when he has emphatically testified under oath that he did not engage in such activity, simply because other record evidence suggests that he did. There appears to be at least a strong equitable argument that a plaintiff should be bound by his own admissions and should be unable to avoid the swing of the summary judgment axe by relying on defense evidence that directly contradicts his own sworn testimony. Despite the glaring significance of this legal issue, neither party offers argument or case law as to its proper resolution. Because there is evidence of protected activity, the Court concludes that the Rule 56 standard forbids it from weighing that evidence against plaintiff's own unambiguous admissions that he did not engage in such protected activity. Considered in the light most favorable to plaintiff, the record does show protected activity on April 8, 2002. On that basis and in the absence of any authority directing a different result, plaintiff can rely on the Elmore memorandum to establish his *prima facie* case, even though plaintiff's own testimony runs directly contrary to that memo.

performance evaluation of August 2002.[32]

### 3. Disciplinary Suspension of April 2004.

Plaintiff also contends that defendants retaliated by imposing a 20-day disciplinary suspension against him in spring 2004. The suspension was later reversed by the Mobile County Personnel Board for procedural infirmities, as a result of which plaintiff's lost time and back wages were restored and the suspension was eradicated from his file.[33]

As an initial matter, the suspension cannot qualify as an "adverse employment action" for Title VII purposes because it was overturned almost immediately, with plaintiff being restored fully to his pre-suspension status. In the absence of any tangible harm to Sullivan, which he has not identified in any event, a rescinded suspension cannot qualify as an adverse employment action for purposes of a Title VII retaliation analysis. *See generally Gupta*, 212 F.3d at 588 ("An action which, it turns out, had no effect on an employee is not an 'adverse' action."); *Stavropoulos*, 361 F.3d at 617-18 (where vote to terminate plaintiff's employment was overridden, and plaintiff remained in same position with same pay and benefits, there is no adverse employment action); *Pennington*, 261 F.3d at 1267 (noting

---

[32] Defendants have placed all of their eggs in the "protected activity" basket by not even articulating legitimate nondiscriminatory reasons for the challenged activities, much less questioning plaintiff's pretext analysis. Even if they had, summary judgment would remain inappropriate on these claims because a jury question is presented as to whether, for example, Elmore rescinded the merit raise recommendation because Sullivan complained of discrimination earlier that day or because Sullivan displayed a poor attitude. Only the finder of fact at trial can sift through and resolve these competing inferences.

[33] Defendants contend that summary judgment is appropriate on the April 2004 suspension claim because there is not sufficient temporal proximity between plaintiff's filing of the EEOC Charge in 2002 and his suspension in 2004 to satisfy the "causal connection" prong of the *prima facie* test. (Defendants' Brief, at 14-15.) However, plaintiff alleges that the disciplinary suspension happened "a very short period of time" after the EEOC made a probable cause determination on the retaliation claim pertaining to the rescission of the merit pay increase. Certainly, close temporal proximity between the EEOC determination and the suspension would create the requisite causal nexus for Title VII retaliation purposes. Defendants have offered no evidence tending to rebut plaintiff's vague contention that the EEOC determination and the suspension were closely linked in time; therefore, their argument that the causal connection of the *prima facie* case is not satisfied cannot succeed.

that Title VII retaliation caselaw "indicates that the decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action").[34] Because Sullivan suffered no tangible harm, the 2004 suspension was not an adverse employment action and he cannot make a *prima facie* showing of retaliation on that basis.

Even if the April 2004 suspension were an adverse employment action, defendants have proffered a legitimate, nonretaliatory reason for their decision to suspend Sullivan for 20 days. In particular, the undisputed evidence shows that on April 12, 2004, Sullivan instigated a heated verbal altercation with Elmore, his direct supervisor, during which Sullivan either explicitly or implicitly threatened physical violence against Elmore. Sullivan has offered no evidence to challenge this account of those events. It is not the function of this Court under Title VII to second-guess the wisdom of the City's proposed discipline of Sullivan for such a clear incident of gross insubordination. *See Wilson*, 376 F.3d at 1092 (reciting well-established principles that courts do not act as super personnel department second-guessing employers' business judgment); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) (recognizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."). Plaintiff having failed to shoulder his burden of showing that the City's explanation for its proposed disciplinary action against him was pretextual and that the real reasons for such action were retaliatory, this claim cannot withstand Rule 56 scrutiny.[35]

---

[34]     In finding that the suspension and various other complained-of conduct do not rise to the level of "adverse employment actions," the Court has proceeded in accordance with the admonition that such a conclusion is appropriate only "after considering all of [plaintiff's] allegations individually and collectively." *Gupta*, 212 F.3d at 588 n.16.

[35]     At most, Sullivan disputes the procedures followed by the City in connection with that decision, and particularly Mayor Bush's "pretyping" of a suspension letter antecedent to the disciplinary hearing. But Sullivan has presented no evidence that either (a) he did not engage in grossly insubordinate and threatening behavior to his direct supervisor in April 2004, or (b) a 20-day suspension is inappropriate or excessive for such misconduct. Under the circumstances, his showing of pretext is wholly inadequate to support an inference that the suspension was retaliatory, or to evade summary judgment.

4.     *Vehicle Damage and Sign Allegations.*

Finally, Sullivan contends that the "attitude" sign in the employee parking lot and the damage to his vehicle were somehow retaliatory acts by defendants.  Once again, plaintiff cannot meet his *prima facie* burden because neither of these allegations implicates an adverse employment action.  Having a "green cockabull" fall from a tree onto a windshield, having a tire punctured by a nail, and having to view a motivational sign in an employee parking lot are nothing more than "the ordinary tribulations of the workplace." *Gupta*, 212 F.3d at 587.  As such, they are not actionable under Title VII. *See id.*; *Bass*, 256 F.3d at 1118 (explaining that "some threshold level of substantiality" must be satisfied for conduct to constitute an adverse employment action, inasmuch as not everything that makes employee unhappy is actionable).  There can be no doubt that these trifling remonstrations do not concern "the terms, conditions or privileges of the plaintiff's job in a real and demonstrable way," and that Sullivan cannot show that a reasonable person in the circumstances would have viewed them as "a ***serious and material*** change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239.  Because these occurrences are not adverse employment actions, plaintiff cannot pursue his retaliation claims arising from same.[36]

**IV.     Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.     Defendants' Motion to Strike (doc. 37) is **denied** on the ground that there is no direct, inherent contradiction between the challenged portions of Sullivan's Declaration and the

---

[36]     Additionally, the record does not support an inference that defendants singled Sullivan out for adverse treatment on any of these metrics.  There is no evidence that defendants caused, directly or indirectly, the damage to plaintiff's windshield and tire.  There is no evidence that plaintiff's cracked windshield claim was treated differently by the City or its insurer than similar claims by other employees; indeed, there is no evidence that any City employee has ever been reimbursed for comparable damage.  And plaintiff admits that he never informed defendants about the punctured tire; therefore, it is unclear how he feels the City's failure to remediate a problem of which he never made it aware could possibly be retaliatory.  And the parking lot sign did not purport to single Sullivan out in any way, but was equally visible and applicable to all Public Works employees.  In light of this uncontroverted evidence, none of these incidents could reasonably support an inference of retaliation, as required to reach a jury.

proffered portions of his deposition testimony.

2.    Defendants' Motion for Summary Judgment (doc. 22) is **granted in part**, and **denied in part.**  Specifically, the Motion is **granted** as to plaintiff's race discrimination claims, all of which are **dismissed with prejudice**.  With regard to plaintiff's retaliation claims, the Motion is **denied** as to retaliation claims relating to defendants' course of conduct from April - August 2002, including rescission of pay increase recommendation, subsequent reprimands or memoranda, and the unfavorable performance evaluation in August 2002.  The Motion is **granted** as to all remaining retaliation claims, including specifically those relating to the April 2004 disciplinary suspension, the damage to plaintiff's vehicle, and the "attitude" sign posted in the employee parking lot.  All of plaintiff's retaliation claims not concerning events of April - August 2002 are **dismissed with prejudice.**

DONE and ORDERED this 9th day of September, 2005.

s/ WILLIAM H. STEELE           
UNITED STATES DISTRICT JUDGE